IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DR. RICHARD MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  2:11cv715-WHA |
| | ) | |
| AUBURN UNIVERSITY MONTGOMERY | ) | (wo) |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case is before the court on a Motion for Summary Judgment (Doc. #24), filed by

Auburn University Montgomery on September 7, 2012, and a Motion to Strike Affidavits and

Other Evidence filed by Auburn University Montgomery on October 9, 2011 (Doc. #34).

Several Plaintiffs filed a Complaint in this court on June 24, 2011, alleging violations of

Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment

Act ("ADEA"), and the Americans with Disabilities Act ("ADA").  The court granted a motion

to sever the various Plaintiffs' claims, and then ruled on subsequent Motions to Dismiss filed by

Auburn University Montgomery ("AUM").  As a result of those rulings, the instant case by

Plaintiff Richard Martin ("Martin") is proceeding on Count II of Martin's Amended Complaint

on claims that Martin was denied tenure and constructively discharged on basis of his gender.

AUM has moved for summary judgment on these remaining claims, as well as a claim for

pattern and practice discrimination.

For the reasons to be discussed, the Motion for Summary Judgment is due to be

GRANTED, and the Motion to Strike is due to be GRANTED in part and DENIED as moot in part.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and  . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56 (c)(1)(A),(B).  Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, the evidence of the nonmovant must be

believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

### III. FACTS

The submissions of the parties establish the following facts, construed in a light most favorable to the non-movant:

The Plaintiff, Martin, began his employment with AUM in a tenure-track position in the Department of Justice and Public Safety in the 2007-08 academic year.  This Department is within the School of Sciences.  Martin had spent more than 30 years in higher education, and had received tenure at two previous institutions.   The schools at which he previously had been tenured did not require publications.  (Martin Dep. at p. 161:21-23).  Martin characterizes his publication history during his academic career as including 40 publications and 40 book reviews, although some of the publications included in that calculation were published after Martin left AUM.   Martin also has had extensive committee memberships, administrative responsibilities, and other professional experience during his academic career.

When Martin was hired at AUM, he was provided a faculty handbook with tenure policies and procedures.  The AUM Handbook provides that a faculty member's previous full-time service in another institution of higher learning may be a significant factor in determining the length of that faculty member's probationary period.   (Doc. #26-2, Tab 3 at p. 44).   The Handbook further provides that a tenure applicant will be evaluated on teaching, research, and

service.  (*Id.*).   AUM has provided the Declaration of Chancellor John Veres ("Veres") in which

he states that with respect to research, a tenure applicant's entire career and body of work is

reviewed and considered.  (Doc. #26-2 at ¶ 10).

The AUM Handbook sets forth a process for seeking tenure.  According to the

Handbook, a faculty member applies for tenure to the Department Head, who then has the

tenured members of the faculty of the Department review the candidate's credentials, and each

presents a written statement of his or her positive or negative vote.  These statements and the

Department Head's written recommendation are sent to the Dean, who adds his or her own

recommendation to the tenure application materials, and all materials are forwarded to the

Chancellor for Academic and Student Affairs.  The University Committee on Promotion and

Tenure, consisting of six academic Deans and three members of the tenured faculty, votes by

secret paper ballot.  All tenure materials are then forwarded to the Vice Chancellor for Academic

and Student Affairs, the Chancellor, and ultimately the President of Auburn University.  (Doc.

#26-2, Tab 3 at p. 43-46). An applicant denied tenure has the right to appeal the denial to an

Appeals Committee.

Before engaging in the tenure application process, Martin underwent pre-tenure review.

Martin provides evidence of a Memorandum dated March 10, 2009, from Dr. Glen E. Ray,

Interim Dean of the School of Sciences, in which he states that Martin's pre-tenure review

committee finds Martin's research to be the area most in need of improvement, and in which he

recommends that Martin have at least three articles in peer-reviewed journals.  (Pl. Ex. C).  He

also states that book chapters are acceptable.  (*Id.*).  Martin states that at the time he applied for

tenure at AUM, he had met that recommendation because he had three peer-reviewed journal

articles and a fourth under review, which was published during the tenure process.  The three

publication recommendation was not written in any AUM tenure policy, however, and Veres has

stated in a Declaration that no AUM employee has the authority to promise, represent, or

guarantee that a certain set of credentials, including the nature and quantity of publications, will

result in a successful tenure outcome. (Doc. #26-2 at ¶11).

Martin applied for tenure during the 2009-2010 tenure cycle.  Martin was Department

Head at that time.  Martin's tenure package was reviewed initially by Ralph Ioimo ("Ioimo") of

the Department of Justice and Public Safety ("JPS"), and Brad Moody ("Moody") and Thomas

Vocino ("Vocino") of the Department Political Science and Public Administration.  Moody and

Vocino were chosen because there was only one tenured faculty member in the Department of

Justice and Public Safety, Ioimo, and additional faculty members were needed for the initial

review.  (Doc. #26-2, Tab 2 at p.27).  Moody and Vocino voted to recommend tenure.   In his

letter to support his vote, Moody stated that Martin's career performance in the area of research

"has not been spectacular," and that Martin's candidacy for tenure was a close call for Moody,

but he voted in support of tenure for Martin given his "solid if limited and unspectacular

teaching evaluations and increased level of professional and scholarly activity in the last year. . .

."  (Doc. #26-2, Tab 2 at p. 21-2).  Vocino wrote that the only real obstacle to Martin getting

tenure was his lack of an active research program, but that Martin had re-established a research

program.  (*Id.* at p. 26).   Ioimo voted to deny tenure to Martin.   Ioimo characterized Martin's

scholarship and research record as "extremely poor."  (*Id.* at p. 23).  He wrote that Martin has

been a college professor for over 30 years and had only three peer reviewed journal articles over

that entire time span.  (*Id.*) Ioimo also stated that the JPS Department recently terminated an

assistant professor who came up for tenure with almost the same publication record. (*Id.* at p. 24).

Martin has stated in an affidavit that Ioimo had a vested interest in Martin being denied tenure because Ioimo could replace Martin as Department Head.

The Dean of the School of Sciences, Karen Stine, next reviewed the tenure application and recommended Martin for tenure, explaining that Martin's lack of an active research program had been identified at pre-tenure review as a possible barrier to tenure, but that in response to his pre-tenure review, Martin had published one article in a peer-review journal, had two upcoming articles, co-authored a training and education booklet, published several book reviews, and made presentations at a number of professional meetings. She said that although his "overall scholarly activity over his career is modest at best, the increase in scholarship following pre-tenure review is an indication of both ability and willingness to increase research productivity. . . ." (*Id.* at p.28). This recommendation, along with the previous materials, were then forwarded to the Chancellor for Academic and Student Affairs for presentation to the University Committee on Promotion and Tenure for written secret ballot vote.

The University Promotion and Tenure Committee recommended that Martin not be given tenure, based on a "lack of demonstrated productivity in scholarship," (*Id.* at p. 249), and all tenure materials were then forwarded to Dr. Keivan Deravi ("Deravi"), Vice Chancellor for Academic Affairs. Deravi agreed with the denial of tenure, as then did the Chancellor, and finally Auburn University's President. Deravi wrote in a memorandum to the Chancellor that Martin's research output had been characterized as "not spectacular," "greatest problem," and "real obstacle and modest at best." (*Id.* at 250). In the letter written by Veres to Martin,

6

informing him of the decision, Veres stated that Martin does not have sufficiently strong performance for tenure in the area of research leading to publications, and that the deficit in publications was of particular concern. (*Id.* at 31). Martin appealed the denial of tenure, and the Appeals Committee upheld the decision to deny tenure.

Martin has pointed to female employees of AUM who were given tenure and whom he states were less qualified for tenure than he was. Those employees include Sue Thompson ("Thompson"), Pia Knigge ("Knigge"), Rhea Ingram ("Ingram"), Gloria McPherson ("McPherson"), Chelsea Ward ("Ward"), Kathy Jones ("Jones"), Connie Buskit ("Buskit"), Jan Hogan ("Hogan"), and Breuna Baine ("Baine"). McPherson was awarded tenure in 2004, Knigge in 2003, Thomson in 1991, and Ingram, Ward, Jones, Buskit, Hogan, and Baine were awarded tenure in the 2009-2010 tenure year. (Doc. #26-2, Tab 1). During the 2009-2010 tenure cycle, seven men were granted tenure, and two, including Martin, were denied tenure.[1]

Martin submitted a letter of resignation to AUM on June 29, 2010. Chancellor Veres invited him to apply for tenure in the next cycle. Martin accepted a tenure track position at Mercer University instead. Martin contends that he did not have enough time in the remaining tenure cycle to finish additional publications and so had to resign from AUM.

### IV. DISCUSSION

#### A. Denial of Tenure

In this case, Martin claims that he was denied tenure because he is a man. In support of his claim, Martin has presented extensive evidence, and argument, about his academic

---

[1] It also appears that Jackie Manning is a woman who was denied tenure in 2009-2010. Although Manning is not identified by gender in the list which indicates denial of tenure (Doc. #26-2, Tab 2 at p.10), Veres identified the men who were denied tenure, and did not include Manning in that list. (Doc. #39).

achievements, and other recognitions.  AUM recognizes that Martin has extensive experience

and recognitions, but contends that such evidence does nothing to demonstrate that Martin's

gender had anything to do with the decision to deny him tenure.

Where, as here, the plaintiff seeks to prove intentional discrimination on the basis of

gender under Title VII by using circumstantial evidence of intent, the court applies the

framework first set out by the United States Supreme Court in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973).  Under this framework, the plaintiff must establish a prima facie

case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  After the plaintiff has established

a prima facie case of discrimination, the burden of production is placed upon the employer to

articulate a legitimate nondiscriminatory reason for its employment action.  *Texas Dep't of Cmty.*

*Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  The plaintiff may seek to demonstrate that the

proffered reason was not the true reason for the employment decision "either directly by

persuading the court that a discriminatory reason more likely motivated the employer or

indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id.* at

256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).  A plaintiff's prima

facie case, combined with sufficient evidence to find that the employer's asserted justification is

false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000).  That is, even if a plaintiff

establishes a prima facie case and offers sufficient evidence of pretext as to each of the proffered

reasons, summary judgment "will sometimes be available to an employer in such a case."

*Chapman v. AI Transport*, 229 F.3d 1012, 1025 n.11 (11th Cir. 2000).

A prima facie case of gender discrimination requires a plaintiff to show that (1) he is a

member of a protected class, (2) he was qualified, (3) he was denied the position, and (4) a similarly-situated applicant was given the position.  *See Arrington v. Cobb Co.*, 139 F.3d 865 (11th Cir. 1998).   The comparator offered to satisfy the fourth prima facie case element must be "similarly situated in all relevant respects." *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010).

### 1.  Prima Facie Case

Martin states that he has met the requirements of the prima facie case, while AUM contests only two elements, by disputing that Martin was qualified for tenure, or that there were similarly-situated females who were given tenure.

In terms of qualifications, the court concludes that Martin has sufficiently shown that he was minimally qualified, and that the objection to his qualification by AUM is more properly evaluated within the context of Martin's pretext argument.  *Kossow v. St. Thomas Univ., Inc.*, 42 F. Supp. 2d 1312, 1315-16 (S.D. Fla. 1999) (finding prima facie was met for the sake of analysis where defendant argued that plaintiff was not qualified because of, and the nondiscriminatory reason was based on, a lack of scholarly publications), *aff'd*, 251 F.3d 160 (11th Cir. 2001) (Table); *Jun Zhang v. Troy University*, No. 2:11cv779, 2012 WL 3631547 (M.D. Ala. July 23, 2012) (finding plaintiff was minimally qualified because plaintiff was recommended for tenure by the chair of his department).

As stated above, to establish the fourth prima facie element, Martin has identified various women who were awarded tenure at AUM.  Generally, "[i]n order to meet the comparability requirement a plaintiff is required to show that he is similarly situated in all relevant aspects to the non-minority employee." *Silvera v. Orange Co. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir.

2001). Tenure decisions, however, are unique because they "involve a myriad of considerations and are made by numerous individuals and committees over a lengthy period of time . . . ." *Grant v. Cornell Univ.*, 87 F. Supp. 2d 153, 158 (N.D. N.Y. 2000) (quotations and citations omitted).

Cases in this circuit examining the similarly-situated inquiry within the context of tenure decisions have found sufficient comparators where the plaintiff and comparator "were faculty members in the same department and sought promotion and tenure in accordance with procedures that were applicable to both, and the time that each applied for promotion and tenure is reasonably related." *Morrow v. Auburn Univ. at Montgomery*, 973 F. Supp. 1392, 1406 (M.D. Ala. 1997); *see also Jun Zhang*, 2012 WL 3631547 at *8. A plaintiff has been found to have failed to present a sufficiently similar comparator where the putative comparator and the plaintiff worked in "different departments, had different department chairmen, and were reviewed, at least in part, by different evaluators." *Hossain v. Steadman*, 855 F. Supp. 2d 1307, 1314 (S.D. Ala. 2012). This approach is consistent with the approach taken by courts in other circuits. *See, e.g., Tapp v. St. Louis Univ.*, 78 F. Supp. 2d 1002, 1016 (E.D. Mo. 2000) (finding comparator was not similarly situated where decisions were separated by six years, under different deans, and the members of the tenure committee were different).

In the context of this case, AUM has provided a Declaration of Veres, the Chancellor of AUM, in which he explains that the tenure process at AUM involves the exercise of professional judgment by each participant, so that "as department heads, deans, chief academic officers, and even chancellors change, there may be corresponding changes in how tenure submissions are evaluated." (Doc. #26-2 ¶7). Veres also explains that there are tenure-review differences

among departments and schools because some may demand strong performance in research and publications while others place more emphasis on teaching. (*Id.* at ¶8).[2]

Martin does not attempt to show that women who were granted tenure were similar to him other than that they were employed by AUM and applied for tenure.  AUM, on the other hand, has identified the departments in which each of the comparators was or is employed, the tenure cycle in which they applied for tenure, and the faculty and administrators who made the tenure decisions at each level and, based on that evidence, has argued that none of the women pointed to by Martin are sufficiently similar to him. (*See* Doc. #26-2, Tab 3 at p. 8-10, #29-2, Ex. M, Q, R; #39).

With regard to proffered comparators Thomson and Knigge, the court has been provided evidence that Thomson is in the School of Sciences, Department of Biology and Knigge is in the School of Sciences, Department of Biology.[3] *(Id.)*  These women were evaluated during earlier tenure cycles than Martin, Knigge in 2002-2003 and Thomson in 1991-1992.  Thomson had no reviewers in common with Martin, and Knigge had only two Promotion and Tenure Committee members in common with Martin.  *(Id.)*  All of the subsequent reviewers for Knigge were different.  These women are not sufficiently similar to Martin to establish a prima facie case of discrimination.  *See Hossain*, 855 F. Supp. 2d at 1314.

---

[2]  AUM has moved to strike Martin's statement in his affidavit that teaching was the largest component of tenure considerations on the basis that it is an improper conclusion and should not be considered.  The court agrees that this statement is due to be stricken on those bases.

[3]  While AUM's brief and Veres's Declaration state that Pia Knigge is in the Biology Department, the documentary evidence indicates that Pia Knigge was granted tenure in the Department of Political Science and Public Administration within the School of Sciences.  This difference is not material, however, because there is no evidence to indicate that Pia Knigge was in the same Department as Martin; namely, the Department of Justice and Public Safety.

11

McPherson is the only comparator pointed to by Martin who was from the same School and Department as Martin; namely, the School of Sciences, Department of Justice and Public Safety.  McPherson was granted tenure in the 2003-2004 tenure cycle.

Although in the same department, McPherson and Martin's tenure cycles were separated by six years.  When McPherson's tenure application was reviewed, the three tenured faculty who voted at the initial stage were different from those who voted on Martin, only two of the eight Promotion and Tenure Committee members were the same, the Acting Dean, Vice Chancellor for Academic Affairs, Chancellor, and Auburn University President were all different.  (Doc. #26-3 p. 9).  Accordingly, the court concludes that while McPherson was from the same department, she and Martin are not sufficiently similar in all relevant respects.  *See Tapp*, 78 F. Supp. 2d at 1016 (finding comparator was not similarly situated where decisions were separated by six years, under different deans, and the members of the tenure committee were different).

Although the court is persuaded by the logic of *Hossain* and other cases that generally where different departments are involved, the court cannot compare candidates for tenure, some of the comparators pointed to by Martin are similar to him even though they were not in the same Department.   Martin and the women who applied for tenure in 2009-2010 were all approved by their different Departments for tenure, and it was not until the University Promotion and Tenure Committee's review that a different decision was recommended as to Martin.   In other words, Martin had decision makers in common with the women comparators who applied for tenure the same year in which he applied, because although the tenure recommendations originated with different departments, they were reviewed by the same University committee, and all subsequent decision makers.  There is one distinction, as pointed out by AUM, in that

Martin was not unanimously approved by his Department.  Baine, one of the women in the tenure cycle who was given tenure, however, also was not unanimously approved by her department.  (Doc. #26-2, Tab 1 at p.10).  Therefore, even if only Baine is sufficiently similar to serve as a comparator, the court concludes that Martin has established a prima facie case of denial of tenure on the basis of gender, and the court will proceed to the *Burdine* burden-shifting analysis.

### 2.  Articulated Reason

AUM's stated non-discriminatory reason for not awarding tenure to Martin is that he did not have sufficient research, one of the three areas evaluated in the tenure process.   Martin has argued that this is not a legitimate reason because it is a subjective one, but the Eleventh Circuit has made it clear that subjective reasons are acceptable non-discriminatory reasons for employment actions.  *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) ( en banc ) (stating that subjective reasons, such as a personal quality, can be "legally sufficient, legitimate, nondiscriminatory reason" if defendant sets out a "clear and reasonably specific factual basis upon which it based its subjective opinion").   Furthermore, tenure "decisions necessarily rely on subjective judgments about academic potential."  *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 968 (7th Cir. 1998).  AUM's articulated reason is a legitimate, non-discriminatory reason for failing to award tenure to Martin.  *See Kossow*, 42 F. Supp. 2d at 1316 (finding that the lack of scholarly publications is a legitimate, nondiscriminatory reason).  Therefore, the burden shifts to Martin to establish that the articulated reason was a pretext for intentional gender discrimination.

### 3.  Analysis of Proferred Evidence of Pretext

As noted earlier, a plaintiff may establish pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or may demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997).

In his brief, Martin has pointed to specific evidence which he contends establish the pretextual nature of AUM's articulated reason.  (Doc. #28 at p. 88-95).   This evidence appears to fall in three categories:  Martin's superior qualifications relative to women who received tenure, procedural irregularities, and evidence of discriminatory intent.  The court will begin its analysis with the last of these categories.[4]

### a.  Evidence of Discriminatory Intent

Martin has presented no evidence of gender-based comments by any AUM employee or decision maker.   Instead, Martin has presented a memorandum from a person identified only as Thomas Wilson ("Wilson"), written to Vocino, and dated January 22, 2003.  In this memorandum, Wilson states that he votes to give tenure to applicant Knigge, but votes not to promote Knigge.  Wilson states that in his view, his own record and Knigge's record are the same, and it took him 11 years to be promoted, so that promoting her now strikes him as "discriminatory."  (Pl. Ex. LL).

---

[4] The court emphasizes that it has evaluated all of the evidence Martin has pointed to in support of his argument that AUM's articulated reason is pretextual, but has not considered evidence which might be contained within the summary judgment record, but to which Martin has pointed only in support of his pattern and practice claim.  Even if this evidence were considered for purposes of this claim, however, most of it concerns race, and it has not been shown to be relevant to the decision makers involved with Martin's tenure decision so as to establish pretext.

The court cannot find that this letter is probative of intent to discriminate on the basis of gender.   Even assuming the opinion is admissible, it is remote in time from the decision at issue, and Wilson does not identify the protected classification upon which he bases the allegation of discrimination.  Furthermore, the record evidence reveals that Knigge was approved for tenure, but not promotion, (Doc. #26-2, Tab 2 at p. 102), so that even accepting Wilson's opinion that promoting Knigge would be discrimination, no such discrimination occurred.

b.  Procedural Irregularities

Deviation from company policy can be circumstantial evidence of discrimination, especially where "established rules were bent or broken to give a non-minority applicant an edge . . . ." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir.1998).

Martin has presented evidence regarding Ioimo and Michael Burger ("Burger") in an attempt to demonstrate that there were procedural irregularities in the review of his tenure application.  Martin has argued that Ioimo should not have reviewed his tenure application because he wanted to deny him tenure so that Ioimo could receive Martin's position as Department Head.   The court agrees with AUM's position, however, that that argument does not establish an intent to discriminate on the basis of gender.

There are two arguments made based on Burger.  One is that Burger should not have served on the University Promotion  and Tenure Committee for Martin because Burger was not tenured.  AUM states that this is an erroneous argument.  Burger is listed on the University Committee as a "Dean," not as one of the three tenured faculty.  (Doc. #26-2, Tab 2 at p. 29). Furthermore,  Burger served on the Committee for all applicants for tenure, including women, so there is no evidence that established rules were ignored to give women applicants an edge.

Martin also relies on Burger's award of tenure as a procedural irregularity.  AUM argues

that Burger's receiving tenure is not evidence of disparate treatment because Burger is a man.

The court agrees that the award of tenure to Burger, a man, undermines Martin's attempt to show

pretext, particularly because Martin says Burger was less qualified than he,[5] but Martin appears

to be arguing that AUM's reliance on Martin's scholarship is not worthy of credence because

Burger was given tenure without meeting the same requirement.  In his brief, Martin states that

while at AUM, Burger only had a book which was yet to be published at the time of his tenure

application.  In support of his argument, Martin has cited only to Burger's curriculum vitae,

which the court has reviewed.  The court cannot agree with Martin's characterization of Burger's

publications, without further evidence, because among his several publications, there are two

publications listed as having been published in 2009, and Burger was employed at AUM in

2009.  (Pl. Ex. X).  Because that is the only information provided to the court in terms of what

Burger's scholarship entailed, the court cannot agree that Martin has presented evidence that

policies and procedures were not followed with regard to Burger.[6]   Furthermore, there has been

_____

[5] Although not in the pretext portion of his brief, Martin has also stated that Ioimo, a man, was less qualified than Martin because he was tenured with only three peer reviewed journal publications.

[6] Martin has also placed the Affidavit of Thomas Vocino in the summary judgment record, but does not rely upon that affidavit in his attempt to establish pretext.  In an abundance of caution, the court will address it as if it has been presented in support of the pretext argument. AUM has moved to strike the statement in Vocino's affidavit that Martin was qualified for tenure and should have received it, and that AUM violated its own polices and procedures in denying him tenure.  At most, Vocino states an impermissible lay opinion that Martin was qualified for tenure under AUM policies and should have been awarded tenure and the Motion to Strike is due to be GRANTED as to that statement.  Even if the court accepts Vocino's affidavit as evidence that rules and procedures were not followed, "[s]tanding alone, deviation from a company policy does not demonstrate discriminatory animus." *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355-56 (11th Cir.1999) (citation omitted).

no showing that "whatever procedural irregularities occurred here were meant to mask actual but unarticulated reasons for the tenure denial." *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 967 (7th Cir. 1998).

c. More Favorable Treatment of Similarly-Situated Women

Martin has presented extensive evidence and argument regarding his qualifications relative to women who received tenure. In evaluating the record for evidence of pretext, the court's inquiry is limited to the employer's mindset, as the "pretext inquiry is concerned with the employer's perception of the employee's performance, not the employee's own beliefs." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1332-33 (11th Cir.1998). As stated by the Eleventh Circuit, "[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030.

While the cases are distinguishable because candidates for tenure are not competing against one another to fill the same positions, the Eleventh Circuit's precedent governing the use of relative qualifications nevertheless seems to provide guidance for the analysis in this case. When comparing relative qualifications in the context of the pretext inquiry, a court must find sufficient evidence from which "a reasonable juror could infer discriminatory intent from the comparison." *Lee v. GTE Florida, Inc.,* 226 F.3d 1249, 1255 (11th Cir. 2000). Where an employee seeks to prove pretext through qualifications alone, the difference in qualifications must be so glaring that no reasonable impartial person could have chosen the candidate selected for the promotion in question over the plaintiff. *Vessels v. Atlanta Ind. Sch. Sys.,* 408 F.3d 763,

772 (11th Cir. 2005).[7]

AUM acknowledges that women in the same tenure cycle as Martin bear some similarity to him, but has argued that these women are not proper comparators because they were employed in different departments.[8]  As discussed, however, because Martin was recommended, albeit only by majority vote, for tenure from his department, he was evaluated by the same University Promotion and Tenure Committee members as the women who were awarded tenure in 2010.  The court will, therefore, examine their relative qualifications.

Baine is the only one of the women who received only majority approval at the peer review stage for tenure.  Martin argues that Baine was less-qualified than Martin because she does not have a Ph.D. and has fewer years of experience and service.

---

[7] The court notes that where the qualifications disparity is not the sole basis for arguing pretext, the disparity need not be so dramatic to support an inference of pretext. *See Vessels,* 408 F.3d at 772.  Having concluded that other evidence pointed to by Martin in his brief is not evidence of pretext, the difference in qualifications in this case must be so glaring that no reasonable person could have chosen the candidates selected for tenure.

[8] As previously discussed, McPherson, Thomson, and Knigge are women who were not similarly-situated to Martin because they were evaluated by different decision makers at every level, at a time remote from Martin's tenure cycle, therefore, the court will not consider evidence concerning them for the pretext inquiry.  *Cf.  Castillo v. Roche Laboratories, Inc.*, 467 F. App'x 859, 864 (11th Cir. 2012) (stating plaintiff failed to present evidence that similarly situated employees were treated differently so as to create an inference of pretext).  However, even if they are proper comparators for pretext analysis despite their dissimilarity for purposes of the prima facie case, the court cannot conclude that their qualifications relative to Martin establish that reliance on his research component of the tenure qualifications was pretextual.  According to Martin, McPherson had only one publication while at AUM in a peer reviewed journal at the time of her tenure application, but her CV reveals four peer-reviewed publications and multiple other publications and presentations. (Pl. Ex. J).  Martin's criticism of Thomson is that she was only the lead author of three peer-reviewed publications of short length and never solely published peer reviewed articles.   Martin states that Knigge was less qualified than he because only three of her six publications were peer-reviewed and she received poor performance evaluations and did not perform webmaster duties.  The memo of Wilson relied on by Martin states that Knigge had acceptable research for tenure and promotion.  (Pl. Ex. LL).

AUM provides a Declaration from Veres in which he has explained that Baine's discipline, Fine Arts, does not require a doctorate degree to be eligible for tenure.  (Doc. #39 at ¶6).  Furthermore, the qualification which forms the basis of AUM's legitimate non-discriminatory reason is Martin's research.  He has not presented evidence to challenge Baine's research qualification.  Therefore, the comparison to Baine does not establish pretext.  *See Vanasco*, 137 F.3d 962, 967 n. 5 (stating that a comparison to a person awarded tenure who did not have a particular degree did not establish pretext where the reason for denial of tenure to the plaintiff did not involve the quality or quantity of degrees the plaintiff had).

The women who were unanimously approved for tenure at the peer review stage and were ultimately awarded tenure during the 2009-2010 tenure cycle are Buskit, Hogan, Ingram, Ward, and Jones. (Doc. #26-2, Tab 1 at p.10).  While they are not as similarly situated as Baine, the court will consider evidence of their relative qualifications.

Martin presents limited evidence as to Buskit and Hogan.  Martin points out that Buskit did not earn a Ph.D. until 2005, and had 19 years in higher education.[9]  Hogan earned her Ph.D. in 2003, so, according to Martin, did not have the number of years of experience and service that Martin has.  Again, the areas of qualification to which Martin has pointed for these women, service and teaching, were areas in which Martin was thought to be qualified for tenure.  It was Martin's research which was found lacking.  Martin does not challenge these women's research qualifications relative to himself.  The court cannot conclude, therefore, that Martin's evidence regarding these women given tenure in 2009-2010 calls into question AUM's stated reliance on

---

[9] AUM has moved to strike Martin's statement in his affidavit that Buskit is far less qualified than he is.  The court agrees that this statement is improper opinion testimony, and the motion is due to be GRANTED as to it.

Martin's scholarship production as a reason to deny tenure.

Ingram, Ward, and Jones are women in the 2009-2010 tenure cycle as to whom Martin has presented some argument and evidence based on scholarship.   Martin's criticism of Ingram is that she had limited years as a professor, she had only published one peer-reviewed journal article for which she was not the lead author, and her peer-reviewed publications were completed prior to her arrival at AUM.   Martin states that Ward was not as qualified as he was because her publications were primarily not in peer-reviewed journals, she was rarely the lead author, and she had less experience than Martin.   Martin makes the argument that Ward's publications were not peer-reviewed or published in a peer-reviewed journal, without citation to any evidence, however.[10]   As for Jones, Martin states that she had only a master's degree, had fewer years of teaching and service, and had only four peer-reviewed publications, and only one of those was in a journal.

AUM points to a letter from Dean Jane R. Goodson to Deravi recommending Ingram for tenure, which states that "Ingram has consistently published in refereed journals in her field and has established a research agenda that shows no sign of letting up after a tenure decision," including six refereed journal articles in five years, proceedings and presentations, and has several papers under review. (Doc. #26-2, Tab 4 at p. 66).

The curriculum vitae of Ward presented by Martin contains several pages of presentations, some research awards, and publications.  (Pl. Ex. M).  The publications include

---

[10] In his affidavit, Martin states that Ward's presentations were merely overseeing her students and she was a teacher who took credit for her students' work and presentation.  AUM has moved to strike these statements as improper conclusions, based on hearsay, and not based on personal knowledge.  The court agrees that the Motion to Strike is due to be GRANTED as these statements.

laboratory manuals, an abstract, and nine separate publications.  AUM presents evidence that Jones's Master's Degree was the terminal degree in her department, Clinical Laboratory Sciences.  (Doc. #39 at ¶5).  Jones's curriculum vitae reflects several oral presentations, three research areas, four publications, and two national presentations.  (Pl. Ex. O).

AUM argues in response to Martin's comparator analysis that Martin's argument discounts publications by women in anything other than peer-reviewed journals, but then counts all of his own publications, whether they were in peer-reviewed journals or not.  AUM argues that Martin had only one peer-reviewed journal publication before arriving at AUM, which had been published 15 years earlier, and the publications he produced after his pre-tenure review were not enough to convince the decision makers that he would maintain research productivity. AUM cites to Martin's deposition in which he agreed that he had no confirmation that AUM considered one of his 2008 publications in his tenure packet as the equivalent of a peer-reviewed scholarly work.  (Martin Dep. 179: 18- 22).   Martin also agreed in his deposition that only one of the publications he had before he arrived at AUM qualified under AUM's tenure standards. (*Id.* at p. 172: 1-6).   AUM further contends that Martin's argument requires the court to engage in publication counting, and an analysis of which publications should be weighed more heavily, which is not the province of the court.  The court agrees.

Martin's publications over many years prior to his arrival at AUM were of varying types. He was told at his pre-tenure review that he needed to establish a research program at AUM. Although he felt he accomplished the research recommended at the pre-tenure review, his research was found to be insufficient to warrant tenure.  A comparison of raw numbers of publications is not sufficient to undermine that reason, given that the court has been pointed to

no evidence of a specified number of publications required by AUM for tenure, and given there is no evidence that research of any compartors prior to employment at AUM was found to be deficient.  The weight Martin seeks to attribute to his comparator's publications, often without evidentiary support in AUM tenure requirements, such as considering whether the comparators were first authors, is the province of the AUM reviewers, not the court or a jury.  *Cf. Kossow,* 42 F. Supp. 2d at 1317 (rejecting plaintiff's argument that his articles were not given sufficient credit, stating "neither the Court, nor the jury need evaluate the degree of scholarship in the law review articles.").  In the context of tenure decisions, the court "must not second-guess the expert decisions of faculty committees in the absence of evidence that those decisions mask actual but unarticulated reasons for the University's actions."  *Vanasco*, 137 F.3d at 968.

As noted, the court has not been presented evidence of research as to all of the relevant comparators, but the court has reviewed the evidence which has been provided of the research and publications of each of the women in a light most favorable to Martin.  The evidence before the court is that Ingram was praised for having a research agenda that would continue after a tenure decision, among other evidence of research; Ward had multiple presentations, research awards, and publications; and Jones had several publications and presentations, as well as research projects.  The court cannot conclude that the difference in research output between Martin and the women awarded tenure is so glaring that no reasonable impartial person could have chosen the women for tenure, and not Martin, so as to establish pretext as to AUM's reliance on the quality of Martin's research as a reason to deny tenure.  Whether or not the court, or a jury, would have given Martin tenure based on his qualification is not the issue.  "Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions."

*Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).   Summary judgment is, therefore, due to be GRANTED as to the denial of tenure claim.

Even if the difference in qualifications of the comparator women are viewed as sufficiently stark to undermine reliance on Martin's research as a reason for tenure denial in this case, the court cannot conclude that a jury question as been presented as to the denial of tenure claim.   "A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000).   The propriety of judgment as a matter of law depends on several factors, which include "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Id.*   In this case, the prima facie case is not a strong one, because there was no woman from Martin's Department and School who was granted tenure during the same, or a temporally close, tenure cycle.   There is no evidence of gender-based comments or animus.   The explanation provided by AUM for denial of tenure, Martin's research, is a consistent one through the levels of tenure review for him, as indicated by evidence in the record.   There is also evidence that supports a finding of no discrimination, including that seven men were granted tenure during Martin's tenure application cycle. (Doc. #39 at ¶ 8).   Accordingly, summary judgment is due to be GRANTED on this alternative basis.

### B.  Constructive Discharge

Martin also claims constructive discharge in this case.   "A constructive discharge occurs when a discriminatory employer imposes working conditions that are so intolerable that a

reasonable person in [the employee's] position would have been compelled to resign.'" *Fitz v. Pugmire Lincoln–Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003) (quotation marks and citation omitted).

Martin's argument is that although he was told he could re-apply for tenure in the next cycle, there was not enough time remaining in the cycle to produce additional publications, so that he was forced to resign. While it may be true that Martin had to seek other employment, that is an argument that Martin was in effect discharged as a matter of fact. There is no evidence of a discharge which rises to the level of legal "constructive discharge" in the Eleventh Circuit. Summary judgment is due to be GRANTED as to that claim.

### C. Pattern and Practice

Finally, Martin states that he has a claim for a pattern and practice of discrimination in this case. While there is no count so-identified in the Amended Complaint, Martin does use the phrase pattern and practice in his factual allegations. (Doc. #3 at p. 22). Because this case has not been certified as a class action, however, summary judgment is due to be GRANTED as to this claim. *See Davis v. Coca-Cola Bottling Co.*, 516 F.3d 955 (11th Cir.2008) (holding that a private litigant cannot maintain a pattern or practice claim unless it is brought as a class action).[11]

### V. CONCLUSION

The court has carefully considered the evidence presented in this case and viewed it in a

---

[11] Much of the evidence AUM seeks to strike relates only to this claim. Because the claim cannot be brought as an individual claim, the Motion to Strike is due to be DENIED as moot as to that evidence.

light most favorable to the non-movant.  It is unfortunate that the Plaintiff, Dr. Martin, thought

that he had accomplished a level of research sufficient to support his tenure application, based in

part on a recommendation from his pre-tenure review.  It is also unfortunate that the Plaintiff

feels that other individuals, both women and men, were awarded tenure who were less qualified

than he.  That having been said, Martin simply has not presented sufficient evidence in this case

from which a reasonable jury could conclude that Martin was denied tenure because of his

gender.  It is not for this court to decide whether there is evidence to support awarding Martin

tenure, but to decide whether there is sufficient evidence for a jury to conclude that Martin was

denied tenure because of his gender.  For the reasons discussed, the court concludes that there is

not, and that there is no evidence to support his claim that he was constructively discharged.

Accordingly, it is hereby ORDERED as follows:

    1.  The Motion to Strike is GRANTED in part DENIED in part as moot, as indicated

above.

    2.  The Motion for Summary Judgment is GRANTED.

    Final Judgment will be entered in accordance with this Memorandum Opinion and Order.


Done this 8th day of November, 2012.


                    /s/ W. Harold Albritton
                    W.  HAROLD ALBRITTON
                    SENIOR UNITED STATES DISTRICT JUDGE